**In re McKESSON HBOC, INC. ERISA LITIGATION**

**No. C–00–20030 RMW.**

United States District Court, N.D. California. San Jose Division.

Sept. 9, 2005.

Ronald S. Kravitz, Liner Yankelevitz Sunshine & Regenstreif, LLP, San Fran-

cisco, CA, Steven Ross, Law Offices of Steven Ross, Atlantic Beach, FL, Counsel for plaintiffs Chang, Huffman, and Dolliver.

J. Brian McTigue, Law Offices of J. Brian McTigue, Washington, DC, Ellen M. Doyle, Malakoff Doyle & Finberg, P.C., Pittsburgh, PA, Counsel for plaintiff Adams.

Raquel L. Wilkening, Folger Levin & Kahn LLP, San Francisco, CA, Counsel for defendants Eckert, Irby, Mayo, Napier, Rumsey, Kappel, Incarnati, Jacobs, Thoele, and Wegmiller.

Timothy Miller, James Lyons, Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, CA, Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, Counsel for defendants McKesson HBOC, HBO & Co., and The Chase Manhattan Bank.

Paul Flum, Morrison & Foerster LLP, San Francisco, CA, Counsel for defendants Friedman, Pietruski, Reichardt and Seelenfreund.

Michael Charlson, Heller Ehrman White & McAuliffe LLP, San Francisco, CA, Moses Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, Counsel for defendant McCall.

Joshua C. Irwin, Paul, Hastings, Janofsky & Walker LLP, San Francisco, CA, Counsel for defendant Gilbertson.

David Hennes, Fired Frank Harris Shriver & Jacobs, New York, NY, James T. Fousekis, DLA Piper Rudnick Gray Cary U.S. LLP, San Francisco, CA, Counsel for defendant Pulido.

Robert R. Ambler, Jr., Womble Carlyle Sandridge & Rice, PLLC, Jill A. Pryor, Bondurant Mixson & Elmore, LLP, Atlanta, GA, Jeffrey L. Bleich, Munger Tolles & Olson LLP, San Francisco, CA, Counsel for defendant Green.

ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT AND (2) DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND CONSOLIDATED AMENDED COMPLAINT

[Re Docket Nos. 84, 100, 116, 118, 120, 122, 123, 124, 291, 320]

WHYTE, District Judge.

Christine Chang and James Huffman ("plaintiffs"), former participants in McKesson Corporation's Profit–Sharing Investment Plan ("the Plan"), bring a class action lawsuit against multiple defendants for their alleged breaches of fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* On January 12, 1999 McKesson Corporation merged with HBOC to form McKesson HBOC. Later that year, McKesson HBOC announced that HBOC had engaged in accounting irregularities. As a result, McKesson HBOC's stock price plummeted and the Plan lost substantial value. On April 30, 1999, McKesson HBOC made its annual contribution to McKesson HBOC's Employee Stock Ownership Plan ("ESOP"). McKesson HBOC made this contribution in the form of stock. That contribution is the only contribution at issue in this litigation.

In March 2003 several defendants moved to dismiss plaintiffs' consolidated amended complaint ("CAC"), including: (1) McKesson HBOC, Inc. and HBO & Company; (2) Charles W. McCall, a former officer and director of HBOC and Chairman of the Board of Directors of the post-merger company for several months; (3) Mark A. Pulido, a former member of both McKesson Corporation's Board of Directors before the merger and the post-merger company for several months, (4) the McKesson Corporation Outside Directors;[1] and (5) the HBOC Outside Directors.[2] Plaintiffs opposed the motions. On May 10, 2005 the court granted preliminary approval of a settlement between plaintiffs and (1) HBOC and (2) its former officers and directors. The court thus stayed plaintiffs' claims against the HBOC subclass. On May 25, 2005 plaintiffs filed a motion for leave to file a second amended consolidated complaint ("SCAC"). The defendants other than the HBOC subclass oppose the motion. The court has reviewed the papers and considered the arguments of counsel.[3] For the reasons discussed below, the court grants defendants' motions to dismiss the CAC except for plaintiffs' allegations that McKesson HBOC breached its duty of prudence by contributing stock to the Plan on April 30, 1999. The court denies defendants' motions with respect to that claim. The court also denies plaintiffs' motion for leave to amend.

---

1. The McKesson Corporation Outside Directors are Tully M. Friedman, John M. Pietruski, Carl S. Reichardt, and Alan Seelenfreund.

2. The HBOC Outside Directors are Alfred Eckert, Alton F. Irby, Gerald E. Mayo, James V. Napier, Philip A. Incarnati, M. Christine Jacobs, Charles E. Thoele, and Donald C. Wegmiller.

3. Before the hearing on plaintiffs' motion for leave to amend on August 1, 2005, the court issued a tentative order granting defendants' motions to dismiss and denying plaintiffs leave to file the SCAC. Plaintiffs then filed a request for leave to file a response to the tentative ruling. Plaintiffs' request violates Local Rule 7–3(d), which does not authorize such filings. The court denies plaintiffs' motion with the narrow exception of correcting a factual error in the tentative ruling that plaintiffs call to the court's attention.

**816**

## I. BACKGROUND

### A. Factual Background

On December 31, 2002 plaintiffs filed the CAC.[4] Plaintiffs assert claims against McKesson HBOC, Inc, the members of McKesson Corporation's Board of Directors before the January 12, 1999 merger, and the members of McKesson HBOC's Board of Directors after the January 12, 1999 merger. CAC ¶¶ 17, 22. The CAC also named the Plan as a nominal defendant. *Id.* at ¶ 24.

### 1. The Plan

The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 28 U.S.C. § 1002(2)(A). CAC ¶ 66. McKesson Corporation is the named fiduciary and administrator of the Plan. *Id.* at ¶ 19. The McKesson Corporation Compensation Committee is responsible for (1) selecting trustees and investment advisors and managers, and (2) the overall investment policy of the Plan. The McKesson Corporation Board of Directors have the authority to determine the investment policies and guidelines to be implemented by the Compensation Committee. *Id.* at ¶ 20.

Participants may make "basic contributions of between 2% and 6% ... and supplemental contributions of between 6% and 10%" of their salary to the Plan. *Id.* at ¶ 69. The Plan also includes an ESOP component under which McKesson Corporation " 'matche[s]' up to the first 6% of each participant's salary-deferral contributions" and makes supplemental contributions based on an employee's age and length of service. *Id.* at ¶¶ 71–72. Although the Plan allows McKesson Corporation to choose between initially contributing cash or company stock, it requires fiduciaries to convert cash contributions into company stock "as soon as practica-

ble." McKesson Plan at §§ 4.3(a) & (c). Plaintiffs allege that "virtually 100%" of the Plan's assets "other than each participant's salary-deferral contributions was held and invested in ... [c]ompany [s]tock" and that company stock "comprised approximately 75% of the overall value of the ... Plan assets." CAC ¶¶ 75–76. The Plan does not allow participants to direct sales of company contributions until they reach the age of fifty-five, or when their age plus years of service exceed sixty-five years. *Id.* at ¶ 77. Thus, participants "could not safely diversify" their holdings. *Id.*

### 2. The Merger

In mid–1998, McKesson Corporation and HBOC began to discuss the prospect of merging. HBOC had hired Arthur Andersen ("Andersen") to audit its 1996 and 1997 financial statements and to review its first and second quarter 1998 financial statements. *Id.* at ¶ 88. McKesson Corporation retained Deloitte & Touche LLP ("Deloitte") to perform accounting due diligence of HBOC. *Id.* at ¶ 87. Deloitte reviewed Andersen's audit work papers. *Id.* at ¶ 88. Deloitte also spoke with HBOC accounting personnel and reviewed additional financial schedules. *Id.* at ¶ 89. On July 12, 1998, Deloitte reported four accounting problems: (1) in 1996 and 1997, HBOC had recognized revenue from customer transactions before the customer had actually committed to purchase, violating generally accepted accounting principles ("GAAP"); (2) HBOC had overstated revenue by failing to defer revenue from maintenance service contracts in violation of GAAP; (3) HBOC had established excess reserves related to acquisitions, and had improperly used these reserves in 1997 and the first and second quarters of

---

4. The court then lifted the Securities Litigation's discovery stay.

1998; and (4) HBOC had understated the reserve for potentially uncollectible customer accounts receivable by approximately $10 million to $25 million. *Id.* at ¶¶ 90–100. Deloitte presented these findings to the McKesson Corporation Board—including Pulido, Richard Hawkins, McKesson Corporation's Chief Financial Officer, and Heidi Yodowitz, McKesson Corporation's Controller—in a meeting on July 13, 1998. *Id.* at ¶ 101. In addition, Deloitte stated that it was highly likely that the United States Securities and Exchange Commission ("SEC") would require HBOC to restate its financials. *Id.* On July 15, 1998 McKesson Corporation announced that it would not merge with HBOC. *Id.* at ¶ 102.

On August 19, 1998 the Center for Financial Research and Analysis—an independent financial research organization—reported that HBOC's revenue recognition had probably been too aggressive ("the CFRA Report"). *Id.* at ¶ 103. The CFRA Report noted several problems with HBOC's bookkeeping, including: (1) an increase in HBOC's accounts receivable, including unbilled balances; (2) a decrease in HBOC's cash flow from operations compared to reported net income; (3) questionable acquisition-related special charges; and (4) the reversal of charges into net income. *Id.* at ¶¶ 103–104. These problems were "in most respects identical" to the problems Deloitte identified. *Id.* at ¶ 105. The CFRA Report also noted that "several insiders had sold a significant number of HBOC shares during 1998." *Id.* at ¶ 106.

However, on October 13, 1998 McKesson Corporation and HBOC again discussed merging. *Id.* at ¶ 108. McKesson Corporation and HBOC agreed to a share exchange ratio of 0.37 McKesson Corporation shares for each share of HBOC. This was an 11% premium over the closing price of HBOC stock on October 16, 1998, but was more favorable to McKesson Corporation than previously-agreed-upon exchange ratios. *Id.* at ¶¶ 108–109. Deloitte updated its accounting due diligence, finding the same four accounting problems as in its earlier report. *Id.* at ¶ 113. Deloitte expressed these concerns to McKesson Corporation's Board. *Id.* at ¶ 114. McKesson Corporation's Board of Directors thus "knew ... that HBOC's financial statements were suspect and there was a substantial risk that the SEC would require" HBOC to restate them. *Id.* at ¶ 116. Despite the fact that McKesson Corporation received a "Fairness Opinion" from Bear Stearns, McKesson Corporation's Board members knew that it was "incomplete" because they had "instructed Bear Stearns to ignore the information uncovered by Deloitte." *Id.* at ¶¶ 118–121. McKesson Corporation's Board and Directors also knew that "[t]he proposed merger ... raised many substantial and very legitimate risk factors": that (1) 75% of all mergers fail to achieve expected results, (2) McKesson Corporation and HBOC were very different, and (3) both companies "had [recently] acquired numerous other businesses." *Id.* at ¶ 122. Finally, Pulido, McCall and Bergonzi "had a financial interest in seeing to it that the merger was completed, in the form of stock options and restricted stock that would vest." *Id.* Nevertheless, the shareholders of both companies approved the merger on January 12, 1999. *Id.* at ¶¶ 125–126. HBOC became a wholly-owned subsidiary of McKesson and the two companies became known as McKesson HBOC. *Id.* at ¶ 12.

On April 1, 1999, several months after the merger of the companies, McKesson merged HBOC's employee benefits plan with the Plan. *Id.* at ¶ 25. Participants in the HBOC Plan received 0.37 shares of McKesson HBOC stock for each HBOC share held in their accounts. *Id.* at ¶ 127.

However, "the McKesson [HBOC] Plan [f]iduciaries failed to consider whether the investment policies and guidelines for the McKesson [Corporation] Plan remained prudent, or whether [c]ompany [c]ontributions should be made in cash in lieu of McKesson [HBOC] [c]ompany [s]tock." *Id.* at ¶ 129.

### 3. The Post–Merger Accounting Restatements

On April 28, 1999 McKesson HBOC announced that HBOC had improperly recorded $16 million in software revenue during the first three quarters of the fiscal year ending March 31, 1999 and $26.2 million in the fourth quarter. *Id.* at ¶¶ 131–132. McKesson HBOC reversed these sales. The company also noted that the audit process was ongoing and that it might identify additional contingent sales. *Id.* at ¶ 131. The company also adjusted its fiscal year 2000 earnings per share projection downward and announced that it expected software revenues of the HBOC subsidiary to decrease from fiscal 1999. *Id.* After this announcement, McKesson HBOC's stock decreased from a closing price of $65.75 on April 27, 1999, to a closing price of $34.50 on April 28, 1999. *Id.* at ¶ 133.

On May 25, 1999 McKesson HBOC announced that it was making additional downward adjustments to software revenues and earnings for the March 31, 1999 fiscal year and quarters. *Id.* at ¶ 134. The company also stated that it might be required to make similar adjustments with respect to previous fiscal years. *Id.* These revisions all related to the HBOC subsidiary. *Id.* McKesson HBOC noted that the company's review of HBOC's financial statements was ongoing, and that it was delaying issuing its financial results for the March 31, 1999 fiscal year. *Id.* After this announcement, McKesson HBOC's stock decreased from a closing price of $38.18 on May 24, 1999, to a closing price of $33.50 on May 25, 1999. *Id.* at ¶ 135.

On July 14, 1999 McKesson HBOC announced that it had completed its investigation and was restating revenues by $245.8 million for the March 31, 1999 fiscal year, $48.8 million for the March 31, 1998 fiscal year, and $33.2 million for the March 31, 1997 fiscal year. *Id.* at ¶ 136. McKesson HBOC also noted that it would revise its net income downward by $152.2 million for the March 31, 1999 fiscal year, $25.8 million for the March 31, 1998 fiscal year, and $13.5 million for the March 31, 1997 fiscal year. *Id.* In addition, McKesson HBOC noted that it would recognize only some of these reversed revenues in the future. *Id.* at ¶ 137. The average closing price of McKesson HBOC stock for the months of May, June, July, and August 1999, was $33.14, $31.31, $30.22, and $30.46, respectively. *Id.* at ¶ 244. Between October 1999 and June 2000, McKesson HBOC stock traded for roughly $20 per share. *Id.*

### B. Procedural background

Discovery in this action was stayed pending the stay of discovery in *In re McKesson HBOC Securities Litigation* ("the Securities Litigation"). On September 30, 2002 the court granted the Defendants' Motions to Dismiss the Change Plaintiffs' First Amended Complaint. *See In re McKesson HBOC, Inc. ERISA Litigation,* 2002 WL 31431588 (N.D.Cal.2002) ("the September Order"). After the hearing on the motions to dismiss the FAC and prior to the issuance of the September Order, the court consolidated *Adams v. McKesson Information Sys.,* C–02–00685 RMW, with *Chang v. McKesson,* C–00–20030 RMW. The court recaptioned the action *In re McKesson ERISA Litigation.*

## 1. The September Order

In the September Order, the court concluded that the McKesson Corporation Board and Compensation Committee and McKesson HBOC Board and Compensation Committee are ERISA fiduciaries "with regard to the investment policies of the ... Plan and [thus] are proper defendants for the alleged breaches of fiduciary duty arising out of investment policy." September Order at *9–*10. However, the court held that plaintiffs could only seek redress from McKesson HBOC itself on their claims stemming from its decision to contribute stock, rather than cash, to the Plan. *Id.* at *10.

The court addressed plaintiffs' argument that defendants breached their duties under ERISA by following the Plan's terms and investing in McKesson Corporation or McKesson HBOC stock. The court explained that ERISA exempts ESOPs from its general duty of diversification. *See* 29 U.S.C. § 1104(a)(2). The court then noted that two out-of-circuit cases, *Moench v. Robertson,* 62 F.3d 553 (3d Cir.1995) and *Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir. 1995), hold that "ERISA imposes fiduciary duties upon ESOP fiduciaries which may require the[m] to deviate from a plan requirement to invest in company stock." September Order at *4. The court expressed doubts about these cases:

> The logic of *Moench* and *Kuper* is not compelling. If there is no duty to diversify ESOP plan assets under the statute, it logically follows that there can be no claim for breach of fiduciary duty arising out of a failure to diversify, or in other words, arising out of allowing the plan to become heavily weighted in company stock. Both cases in effect hold that ERISA's fiduciary duty of prudent investment trumps the express statutory exemption from the duty to diversify.

*Id.* at *5. Moreover, the court noted that *Moench* and *Kuper* "may be distinguishable" on the grounds that both cases involved ESOP plans that required the companies to make contributions "primarily" in company stock, while the Plan requires McKesson HBOC to make all contributions either (1) in stock or (2) in cash that is converted to stock "as soon as practicable." *Id.* Thus, the court reasoned, the Plan fiduciaries have less discretion than the fiduciaries in *Moench* and *Kuper.* *Id.* Nevertheless, because the Plan gave fiduciaries *some* discretion—the choice between making contributions in stock or cash—the court determined that it could not foreclose the possibility that the fiduciaries could be liable for abusing this discretion. The court set forth a framework to evaluate this issue:

> Assuming that *Moench* and *Kuper* apply, then an ESOP fiduciary may not blindly follow an ESOP plan's directive to invest in company stock and may be liable for breach of fiduciary duty if such investment was imprudent. However, these cases recognize that there is a presumption that the fiduciary's decision to follow the plan was reasonable and the presumption may be rebutted by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision and that the fiduciary abused his, her or its discretion by following the Plan and investing in employer securities. Plaintiffs must also demonstrate a causal link, specifically, that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.

*Id.* at *5 (citations omitted).

The court then applied this standard and held that the FAC was deficient in several ways. First, the court concluded that plaintiffs failed to allege "facts, not mere

conclusions," that defendants abused their discretion by allowing the Plan to become overly weighted in company stock before the merger. *Id.* at *6.

Second, the court considered plaintiffs' claim that defendants breached their duties by failing to divest the Plan of company stock after the merger but before the announcement of HBOC's accounting irregularities. The court determined that this theory was flawed because plaintiffs had failed to articulate what lawful conduct defendants could have taken to stop the Plan from declining in value. Indeed, the court reasoned, the McKesson HBOC fiduciaries could only have (1) sold the stock without disclosing HBOC's wrongdoing, thus engaging in illegal insider trading or (2) disclosed the improprieties, causing the stock price to fall immediately. *Id.* at *6–*7. Thus, the court held that plaintiffs failed to allege that this purported breach caused the Plan's losses. *Id.* at *7.

Third, the court evaluated plaintiffs' assertion that defendants breached their duties by continuing to invest in company stock after the merger. *Id.* at *8. Defendants claimed that (1) the company increased the number of shares it contributed after the merger to accommodate the lower stock price and (2) company stock has outperformed the market since the fallout over HBOC's wrongdoing. *Id.* The court rejected defendants' arguments, holding that they were "evidentiary in nature and go beyond what may properly be considered on a motion to dismiss." *Id.* However, the court dismissed this count with leave to plead the underlying facts with greater specificity. *Id.*

Fourth, the court acknowledged that, if pled in more detail, plaintiffs could state a claim for McKesson HBOC's failure to make contributions in the form of cash, as opposed to stock. *Id.* Finally, the court dismissed plaintiffs' co-fiduciary liability claims because they failed to explain (1) what duties defendants breached, (2) which defendants knew about these breaches, (3) how each defendant did not make reasonable efforts to remedy the breaches, (4) what acts defendants took to conceal information, and (5) what damages or harm resulted. *Id.* at *17.

### 2. The CAC

Plaintiffs' seventh cause of action claims that individual McKesson Corporation Board members breached their fiduciary duties of prudence, loyalty, and diversification under ERISA § 404, 29 U.S.C. § 1104 ("section 404") during the period before the January 12, 1999 merger. CAC ¶¶ 196–220. Plaintiffs' eighth cause of action alleges that individual McKesson HBOC Board members breached their section 404 duties between January 12, 1999 through April 20, 1999, after the merger but before McKesson HBOC publicized HBOC's accounting irregularities. *Id.* at ¶¶ 221–235. Plaintiffs' ninth cause of action asserts that the individual McKesson HBOC Board members breached their section 404 duties after the announcement on April 28, 1999. *Id.* at ¶¶ 236–251. Plaintiffs' tenth cause of action claims that McKesson HBOC (1) breached its duties under section 404 by making contributions in stock rather than cash and (2) is liable for the individual Board members' wrongdoing "under the law of agency, including the principles of vicarious liability and respondeat superior." *Id.* at ¶¶ 252–258.[5] Plaintiffs' twelfth cause of action alleges

---

**5.** Plaintiffs voluntarily dismissed their eleventh cause of action, which alleged that the McKesson Corporation and McKesson HBOC Board members breached their duties under section 404 by maintaining company stock as an investment option for participant salary-deferral contributions. CAC ¶¶ 259–271.

that defendants are subject to co-fiduciary liability under ERISA § 405(a), 29 U.S.C. §§ 1105(a)(2)-(3) ("section 405"). *Id.* at ¶¶ 272–277. Plaintiffs' thirteen cause of action claims that McCall is liable under section 404 and under equitable principles. *Id.* at ¶¶ 278–281.

### 3. The Proposed SCAC

On May 25, 2005 plaintiffs requested leave to file the SCAC.[6] The SCAC adds citations and quotes from articles to support the proposition that "75% of mergers fail to achieve expected results." SCAC ¶ 122(a). The SCAC also alleges that McKesson HBOC, McCall, Pulido, Bergonzi, and Hawkins engaged in a variety of post-merger wrongdoing, including improperly recognizing revenue from thirty-seven contracts in the first quarter after the merger. *Id.* at ¶ 140A. One contract in particular, with Data General Corporation, led to McKesson HBOC's improper recognition of $20 million in revenues. *Id.* McCall and Hawkins were "directly involved" in the Data General transaction. *Id.* at ¶ 140B, 140D(d). Bergonzi "knew of and participated in" this fraud. *Id.* at ¶ 140D(a). Pulido also knew about the fraud and yet failed to make the 1999 plan contribution in cash. *Id.* at ¶ 140C. Moreover, "[d]efendants neither considered nor evaluated the prudence of the investment

policy of the … Plan regarding its holdings in McKesson [HBOC] stock, or whether to continue contributing cash or … [s]tock to the Plan … at any time during this timeframe …." *Id.* at ¶ 140E (emphasis omitted). Finally, McKesson HBOC's decision to contribute stock in 1999 occurred on April 26, 1999—after the company knew that it was going to have to restate its earnings—and was therefore imprudent.[7]

## II. ANALYSIS

### A. Legal Standards

### 1. Motions to Dismiss

Dismissal under Federal Rule of Civil Procedure Rule 12(b)(6) is proper only when a complaint exhibits either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept the facts alleged in the complaint as true. *Id.* "A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gilligan v. Jamco Dev.Corp.*, 108 F.3d 246, 248 (9th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[8]

6. Plaintiffs also allege that McKesson CFO Hawkins was a fiduciary of the McKesson Plan.

7. However, as noted below, the parties now seem to agree that McKesson HBOC made the 1999 contribution on April 30, 1999, after McKesson HBOC announced HBOC's accounting improprieties.

8. Under most circumstances, Federal Rule of Civil Procedure 8 governs complaints for breach of ERISA fiduciary duties. *See Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995). Rule 8 states that a complaint should include "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). At the same time, however, "bare bones allegations" may not suffice under Rule 8. September Order at *8. In addition, when a plaintiff claims that a defendant's fraud constitutes a breach of fiduciary duty, courts may apply the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Concha*, 62 F.3d at 1502 (holding that "Rule 9(b) is not applicable in cases in which the complaint alleges breaches of fiduciary duty under ERISA, and does not allege fraud or mistake"); *Cokenour v. Household Int'l*, 2004 WL 725973, at *7 (N.D.Ill. Mar.31, 2004) (applying Rule 9(b) to claims

## 2. Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a) instructs courts to give leave to amend "when justice so requires." Courts weigh four factors when deciding whether the grant leave to amend: "undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party." *Serpa v. SBC Telecomms., Inc.*, 318 F.Supp.2d 865, 870 (N.D.Cal.2004). "The party opposing amendment bears the burden" of proving that leave is inappropriate. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir.1987). Futility alone can be grounds for denying a motion for leave to amend. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir.1990).

## B. Motion to Dismiss

ERISA section 502(a) allows participants to seek relief on behalf of an ERISA plan. *See* 29 U.S.C. § 1132(a)(2). Under ERISA section 409 ("section 409"), any ERISA plan fiduciary who breaches a fiduciary duty may be personally liable for any losses resulting from the breach. *See* 29 U.S.C. § 1109(a). The Plan is also a member of the class of shareholders in the separate but related class action seeking to recover from the defendants for their alleged securities fraud in connection with the merger.

## 1. Counts Seven, Eight, and Nine

Section 404 requires ERISA fiduciaries to discharge their duties (1) "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries" and (2) with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(A) and (B). In addition, section 404 requires fiduciaries to "diversif[y] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). However, section 404 also provides that "acquisition or holding" of company stock by ESOPs do not violate "the diversification requirement" and "the prudence requirement (only to the extent that it requires diversification)." 29 U.S.C. § 1104(a)(2).

*Moench* considered the relationship between these provisions. In that case, Statewide Bancorp ("Statewide") offered an ESOP that required assets to be invested "primarily" in Statewide stock. However, Statewide's ESOP Committee interpreted the plan to mandate investment in Statewide stock. Statewide's common stock fell from $18.25 per share in 1989 to less than 25 cents per share in 1991, when Statewide filed for bankruptcy. Despite repeated warnings from federal authorities and Statewide insiders, "the Committee [never] met to discuss any possible effects on the ESOP or any actions that it should take." *Moench*, 62 F.3d at 559. Moench, a participant in the ESOP, then sued for breach of section 404. The district court granted summary judgment in favor of the Committee, reasoning that the Committee's interpretation of the ESOP was entitled substantial deference. *Id.* at 562.

The Third Circuit disagreed. It first held that because "[t]he Committee points to nothing in the record indicating that it . . . actually deliberated, discussed or interpreted the plan in any formal manner,"

under ERISA that defendants made misrepresentations). Because the court finds it unnecessary to consider whether plaintiffs have alleged the occurrence of particular instances of fraud with the requisite specificity, the court applies Rule 8 to plaintiffs' claims.

a *de novo* standard of review applied to its interpretation of the ESOP. *Id.* at 568. Thus, construing the ESOP, the court determined that the ESOP "did not absolutely require the Committee to invest exclusively in Statewide stock." *Id.* at 568. The court then considered whether the Committee could *ever* be liable for investing solely in Statewide stock in light of the fact that ESOPs are " 'designed to invest primarily in qualifying employer securities' " and thus, "unlike pension plans, are not intended to guarantee retirement benefits." *Id.* (quoting 29 U.S.C. § 1107(d)(6)(A)). The court explained that "under normal circumstances, ESOP fiduciaries cannot be taken to task for failing to diversify investments, regardless of how prudent diversification would be under the terms of an ordinary non-ESOP pension plan." *Id.* Nevertheless, analogizing to trust law, the court determined that "there may come a time" when investing in company stock "no longer serve[s] the purpose of the trust, or the settlor's intent." *Id.* at 571. Accordingly, the court held that an ESOP fiduciary's decision to continue investing in employer securities is entitled to substantial discretion:

> [W]e hold that in the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities. In attempting to rebut the presumption, the plaintiff may introduce evidence that 'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.' As in all trust cases, in reviewing the fiduciary's actions, the court

must be governed by the intent behind the trust—in other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate.

*Id.* at 571 (quoting Restatement (Second) Trusts § 227, com. q). The court remanded the case for the district court to evaluate whether "the precipitous decline in the price of Statewide stock, as well as the Committee's knowledge of its impending collapse and its members' own conflicted status" constituted "changed circumstances to such an extent that the Committee properly could effectuate the purposes of the trust only by deviating from the trust's direction . . . ." *Id.* at 572.

In *Kuper*, the Sixth Circuit adopted *Moench*'s presumption of reasonableness. Quantum Chemical Corporation sold its Emery Division to Henkel Corporation. The agreement provided that Henkel would accept a trust-to-trust transfer of Quantum employees' ESOP assets. However, the transfer did not actually occur until a year and a half after Henkel purchased Emery. While the transfer was pending, Quantum's stock price declined from $50 per share to $10. Although the ESOP provided only that it was "designed to invest primarily" in Quantum stock, no members of the Quantum benefits committee ever considered diversifying or liquidating the plan. *Kuper*, 66 F.3d at 1450–51. Plaintiffs sued under section 404. A bench trial resulted in a judgment for defendants.

The Sixth Circuit affirmed. The court rejected plaintiffs' theory that defendants had breached their duties under section 404 by failing to consider diversifying or liquidating plan assets during the pendency of the trust-to-trust transfer. *Id.* at

1459–60. The court reasoned that plaintiffs could not prove that the fiduciaries' alleged failure to investigate damaged the plan without showing that the investigation would have revealed that continuing to hold company stock was imprudent. *See id.* Although plaintiffs had introduced evidence that (1) defendants were aware that Quantum's stock would likely decrease and (2) Quantum's CEO had sold his shares, the court noted that defendants had also presented evidence that Quantum's stock price fluctuated and that "several investment advisors recommended holding Quantum stock." *Id.* at 1460. Thus, the court held that plaintiffs had failed to rebut the *Moench* presumption that continuing to hold company stock was reasonable. *Id.* at 1459–60.

However, *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090 (9th Cir.2004) casts doubt on whether *Moench* and *Kuper* are the law of this circuit. Oregon Metallurgical Group ("Oremet") established an ESOP that allowed participants to sell up to 40% of company shares in their accounts. As Oremet's stock price rose, participants requested greater diversification rights. Oremet thus amended the plan to permit participants to sell up to 85% of their company shares. Oremet then merged with Allegheny Teledyne. The price of Oremet stock increased from about $23 to about $33 per share in just four days. Plaintiffs petitioned Oremet to sell all their company stock, but Oremet refused. Eventually, the price of Oremet stock decreased to about $8 per share. Plaintiffs sued under section 404. The district court dismissed their claims.

The Ninth Circuit affirmed. Citing the September Order, it questioned the reasoning of *Moench,* noting that its "intermediate prudence standard is difficult to reconcile with ERISA's statutory text, which exempts [ESOPs] from the prudence requirement to the extent it requires diversification." *Id.* at 1097. The court explained that *Moench* "threatens to eviscerate congressional intent and the guiding rationale behind [ESOPs]" because "unlike traditional pension plans," ESOPs are designed to give employees an equity interest in their company, not "to guarantee retirement benefits." *Id.* at 1097 & n. 2. Moreover, the court reasoned, "[t]he *Moench* standard seems problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees. Such activities could potentially run afoul of the federal securities laws." *Id.* at 1098 n. 4.

Nevertheless, the court noted that "the facts of this case do not necessitate that we decide whether the duty to diversify survives the statutory text of § 1104(a)(2)" because "[p]laintiffs' prudence claim is unavailing under any existing approach." *Id.* at 1097–98. The court reasoned that if there is no duty to diversify ESOPs, then "[d]efendants' refusal to diversify the [p]lan beyond the level of 85% clearly does not constitute an actionable violation of ERISA's prudence requirement." *Id.* at 1098. On the other hand, the court pointed out, even if *Moench* applies, plaintiffs had failed to allege that Oremet's financial situation was so dire that plan fiduciaries abused their discretion by continuing to hold company stock:

> The published accounts of Oremet's earnings and financial fundamentals during the relevant period, attached to the complaint, demonstrate that Oremet was far from the sort of deteriorating financial circumstances involved in *Moench* and was, in fact, profitable and paying substantial dividends throughout that period .... Mere stock fluctuations, even those that trend downward significantly, are insufficient to establish

the requisite imprudence to rebut the *Moench* presumption .... The *Moench* standard does not compel fiduciaries to permit further diversification of EIAP pension plans upon each subsequent rise in share value attributed to a merger, or, for that matter, any other major corporate development.

*Id.* at 1098–99. Against this backdrop, the court now considers plaintiffs' claims.

### a. Section 404 Bars Plaintiffs' Seventh, Eighth, and Ninth Causes of Action to the Extent They Allege Breaches of the Duty of Prudence

■ The court first holds that plaintiffs' seventh, eighth, and ninth causes of action fail to state a claim for breach of the duty of prudence because fiduciaries cannot be liable for failing to divest an ESOP of company stock. *See Wright,* 360 F.3d at 1097 ("[i]nterpreting ERISA's prudence requirement to subject [ESOPs] to an albeit tempered duty to diversify arguably threatens to eviscerate congressional intent and the guiding rationale behind [ESOPs] themselves"). The United States Supreme Court has explained that statutory interpretation "begin[s] with the understanding that Congress says in a statute what it means in a statute and means in a statute what it says there" and noted that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms". *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Because section 404 unequivocally declares that ESOP fiduciaries may "hold" company stock even when a prudent fiduciary would diversify the plan, the court examines *Moench*'s justification for departing from the statute's text with care.

*Moench* relied upon upon *Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978), *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *Martin v. Feilen,* 965 F.2d 660 (8th Cir.1992), *Fink v. National Sav. & Trust Co.,* 772 F.2d 951 (D.C.Cir.1985), and *Canale v. Yegen,* 782 F.Supp. 963 (D.N.J. 1992) to hold that section 404 does not absolve fiduciaries from liability stemming from their failure to diversify an ESOP. Yet *Eaves, Donovan,* and *Martin* do not suggest that ESOP fiduciaries can be liable for failing to sell company stock. Instead, these cases reveal that ESOP fiduciaries can be liable for engaging in *other forms of imprudence:* paying too much for employer securities, charging a commission, or acquiring stock for prohibited reasons.[9] *Moench* questionably jumps from the premise that ESOP fiduciaries are *generally* subject to the duty of prudence to the determination that ESOP fiduciaries may breach the duty of prudence by refusing to sell company stock. The duty of prudence is broader than—and, in fact, encompasses—the duty of diversification. *Moench* does not appear to recognize that

---

**9.** The court has no quarrel with the notion that ESOP fiduciaries may be liable for such wrongdoing. As Congress noted, ERISA outlaws these forms of misconduct:

> An ESOP fiduciary may not buy employer securities at inflated prices. If securities are qualifying employers securities they generally can be acquired or held notwithstanding the prohibited transaction rules, if acquisition is for adequate consideration and no commission is charged and if acquisition is allowed by the employers security

rules.... Thus, while a plan may be able to acquire employers securities or real property under the employers security rules, the acquisition must be for the exclusive benefit of participants and beneficiaries. Consequently, if the real property is acquired primarily to finance the employer, this would not meet the exclusive benefit requirement....

House Conf. Rep. No. 93–1280, 93d Cong., 1st Sess., Reprinted (1974) U.S.Code Cong. & Admin. News, pp. 5038, 5100.

there is nothing inconsistent with section 404 simultaneously (1) imposing a multi-faceted duty of prudence upon ESOP fiduciaries and yet (2) exempting them from one particular aspect of it: the duty to diversify.

For example, in *Eaves,* the Tenth Circuit affirmed the district court's determination that a fiduciary breached the duty of prudence by purchasing stock for an ESOP with a large advance from the company. *See Eaves,* 587 F.2d at 456, 462. The court reasoned that section 404's exemptions did not apply because "the structure of [ERISA] itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of s[ections] 404(a)(1)(A) and (B)." *Id.* at 459. Notably, *Eaves* did *not* hold that the fiduciary breached his duty of prudence by failing to *divest* an ESOP of employer securities. In fact, *Eaves* explained that "ESOP fiduciaries are subject to the same fiduciary standards as any other fiduciary *except to the extent that the standards require diversification of investments.*" *Id.* at 460 (emphasis added).

Citing *Eaves,* the Fifth and Eighth Circuit have held ESOP fiduciaries liable for engaging in forms of wrongdoing that have nothing to do with the failure to diversify. *See Donovan,* 716 F.2d at 1473 (holding that ESOP fiduciaries breached the duty of prudence by failing to verify that a previous "appraisal remained a reasonable approximation of the fair market value of [company] stock at the times they relied on it"); *Martin,* 965 F.2d at 671 (holding that fiduciaries violated section 404 when "[t]he ESOP paid too much for [company] stock ... [and] sold [company] stock for less than its price in contemporaneous

transactions"). In fact, *Donovan* noted that "ESOP fiduciaries remain subject to the general requirements of [s]ection 404 ... [e ]xcept those relating to diversification.*" Donovan,* 716 F.2d at 1467 & n. 25 (emphasis added). Similarly, *Martin* noted that "the special statutory rules applicable to ESOPs," including section 404's exemption of ESOPs from the diversification requirement, "inevitably affect the fiduciary's duties under [section 404].*" Martin,* 965 F.2d at 665. *Moench* cited *Eaves, Donovan,* and *Martin* for the proposition that "cases addressing the duties of ESOP fiduciaries in this area generally have allowed ERISA's strict standards to override the specific policies behind ESOPs.*" Moench,* 62 F.3d at 569. But, as noted, these cases do *not* hold that an ESOP fiduciary can breach section 404 by failing to sell company stock. In fact, these cases acknowledge that section 404 exempts ESOP fiduciaries from any duty to diversify.

In *Fink,* the D.C. Circuit examined whether the statute of limitations barred claims that ESOP fiduciaries breached section 404 by, *inter alia,* "acquiring and retaining [company] stock" when the company "took a serious downturn due to the loss of their largest customer.*" Fink,* 772 F.2d at 954, 956. Although the D.C. Circuit cited *Donovan* and *Eaves* for the proposition that ESOP fiduciaries must comply with the duty of prudence, it recognized that ESOPs need not diversify:

Acquisition of employer securities by an [ESOP] does not, in and of itself, violate any of the absolute prohibitions of ERISA. *In addition, the requirement of ERISA that a plan diversify its assets, does not apply to the holding of employer securities by [ESOPs ].* However, the requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the

interest of plan participants continue to apply.

*Id.* at 955 (emphasis added) (citations omitted). The D.C. Circuit ultimately held that the statute of limitations did not bar plaintiffs' claims. *Id.* at 957–60. Thus, *Fink* (1) acknowledged that ESOPs are exempt from the diversification requirement and (2) did not squarely address the issue of whether section 404 bars claims that ESOP fiduciaries breached their duty of prudence by failing to sell company stock.

Nevertheless, in *Canale,* a New Jersey district court read *Fink* to hold that section 404's exemptions "merely entail that '[a]cquisition of employer securities ... does not, in and of itself, violate any of the absolute prohibitions of ERISA.' " *Canale,* 782 F.Supp. at 967 (quoting *Fink,* 772 F.2d at 955). *Canale* thus concluded that section 404's exemptions do not preclude liability for failing to diversify an ESOP. *See id.* However, *Fink* never states that section 404's exemptions "merely entail" that an ESOP may lawfully acquire company stock. *Fink* actually cites a different ERISA section, 29 U.S.C. 1108(e) ("section 408"), for the proposition that "[a]cquisition of employer securities by an [ESOP] does not, in and of itself, violate any of the absolute prohibitions of ERISA." *Fink,* 772 F.2d at 955. *Canale* seemingly distorts this language from *Fink* by (1) adding the key limiting words "merely entail" and (2) ignoring the fact that *Fink* is discussing section 408, not section 404. *Canale* is the only case *Moench* cites that actually holds a fiduciary liable for failing to diversify an ESOP. *See Moench,* 62 F.3d at 569–70. *Canale's* apparent misreading of *Fink* calls *Moench* into question.

*Moench* also reasoned that because a trust instrument can waive the general requirement that the trustee diversify assets, "the provision in ERISA exempting ESOPs from the duty to diversify is simply a statutory acknowledgment of the terms of ESOP trusts." *Moench,* 62 F.3d at 571. Like *Canale, Moench* posits that section 404's exemptions merely *permit* ESOPs, unlike other pension plans, to invest primarily in company stock. There are serious problems with this position. For one, section 408 already fulfills the function of authorizing ESOPs to invest heavily in company stock. *Compare* 29 U.S.C. § 1106 (prohibiting certain transactions between plans and interested parties) *and* 29 U.S.C. § 1107 (prohibiting plans from investing in more than ten percent of employer stock) *with* 29 U.S.C.A. § 1108(e)(1)-(3)(A) (" [s]ections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities ... if the plan is an [ESOP]"). *Moench* 's interpretation of section 404 thus violates the axiom that "court[s] generally refus[e] to interpret a statute in a way that renders a provision superfluous." *Government of Guam v. U.S.,* 179 F.3d 630, 634 (9th Cir. 1999). In addition, nothing in section 404 indicates that it serves such a limited purpose. Instead, Congress stated section 404's exemptions in unqualified terms: "the diversification requirement ... and the prudence requirement (only to the extent that it requires diversification) ... *is not violated* by acquisition or holding of [company stock]." 29 U.S.C. § 1104(a)(2) (emphasis added). This sweeping language is difficult to square with *Moench* 's narrow view of the statute.

Finally, section 404's sparse legislative history does not support *Moench* 's departure from the statute's express text. The Senate Report compares section 404 to section 408 and notes that both provisions are necessary to avoid "prohibit[ing] transactions which [are] desirable to sound, effi-

cient functioning of employee benefit plans." Senate Report No. 93–127, 93d Cong., 1st Sess., Reprinted (1974) U.S.Code Cong. & Admin. News, p. 4838, 4867. The Senate Report then expresses a broad concern with chilling an ESOP fiduciary's freedom to invest in company stock:

> It is emphasized, however, that even with respect to the transactions expressly allowed [under section 408], the fiduciaries' conduct must be consistent with the prudent man standard. In recognition of the special purpose of profit-sharing and similar plans, the (10%) limitation does not apply to such plans if they explicitly provide for greater investment in the employer securities, *nor should any diversification principle that may develop from application of the prudent man principle be deemed to restrict investment by profit-sharing plans in employer securities....*

*Id.* at 459–60 (quoting Senate Report No. 93–127, 93d Cong., 1st Sess., Reprinted (1974) U.S.Code Cong. & Admin. News, p. 4838, 4867) (emphasis added). Similarly, when Congress passed the Tax Reform Act of 1987, it indicated that it was "deeply concerned that the objectives sought by [the series of laws encouraging ESOPs] will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans ...." *Donovan,* 716 F.2d at 1466 n. 24 (quoting Pub.L. No. 94–455, § 803(h), 90 Stat. 1590 (1976)).

These statements suggest a fundamental flaw in *Moench*'s logic. By opening the door to section 404 liability, *Moench* places ESOP fiduciaries in an unenviable position. On the one hand, fiduciaries will face liability if they incorrectly adhere to the ESOP during an economic downturn. At the same time, fiduciaries will face liability if they unnecessarily deviate from the ESOP. *See California Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d 1036, 1042 (9th Cir.2001) (noting that failure to follow a written investment policy can "constitut[e] a breach of fiduciary duty"). *Moench* acknowledged this tension, but nonetheless concluded that ESOP fiduciaries " 'must satisfy the demands of Congressional policies that seem destined to collide.' " *Moench,* 62 F.3d at 569 (quoting *Donovan,* 716 F.2d at 1466). Yet section 404's exemptions and Congress' desire to avoid (1) "restrict[ing] investment" in company stock and (2) treating ESOPs "as conventional retirement plans" indicate that it did not intend to force ESOP fiduciaries to balance these concerns.[10] Instead, Congress fashioned a bright-line exclusion for ESOP fiduciaries from liability for their alleged failure to sell company stock. When Congress has resolved competing concerns within ERISA, "[w]e will not attempt to adjust the balance ... that the text adopted by Congress has struck." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 263, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Although such a policy may seem unfair to participants, ESOPs "are not intended to guarantee retirement benefits

---

10. According to *Moench,* ERISA's "[b]road [p]urpose" of " 'safeguarding the interests of participants in employee benefit plans by vigorously enforcing standards of fiduciary responsibility' " conflicts with ESOP-specific rules, such as section 404 and 29 U.S.C. § 1107(d)(6)(A), which provides that ESOPs are "designed to invest primarily in qualifying employer securities." *Moench,* 62 F.3d at 560, 569 (quoting *Donovan,* 716 F.2d at 1466).

But just because ERISA has "[b]road [p]urpose[s]" does not mean that courts must interpret ESOP-specific rules with these goals in mind. Indeed, "Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals." *In re Cavanaugh,* 306 F.3d 726, 732 (9th Cir.2002).

and indeed, by their very nature, 'place[ ] employee retirement assets at much greater risk than does the typical diversified ERISA plan.'" *Wright*, 360 F.3d at 1097 n. 2 (quoting *Martin*, 965 F.2d at 664) (alteration in original). Accordingly, the court respectfully disagrees with *Moench* and holds that section 404 prohibits claims against fiduciaries for failing to diversify an ESOP.[11] Because section 404 bars plaintiffs' seventh, eighth, and ninth causes of action to the extent that they allege that the McKesson Corporation Board members or McKesson HBOC Board members failed to sell company stock, the court dismisses these claims with prejudice.

### b. Count Seven, Eight, and Nine Fail to State a Claim under Moench and Wright

Alternatively, the court considers whether plaintiffs' seventh, eighth, and ninth causes of action state a claim under "any existing approach," including *Moench*'s presumption of reasonableness. *See Wright*, 360 F.3d at 1098. Assuming that *Moench* applies, the court considers each of plaintiffs' causes of action in turn.

#### i. Count Seven

Plaintiffs' seventh cause of action in the CAC alleges that McKesson Corporation's Board members breached their fiduciary duties before the January 12, 1999 merger. The pre-merger McKesson Corporation Board included Pulido—the CEO of McKesson Corporation and McKesson HBOC from April 1, 1997 until his resignation on July 15, 1999—and McKesson Corporation Outside Directors Friedman, Pie-

truski, Reichardt, and Seelenfreund. CAC ¶ 20.[12] Plaintiffs claim that the pre-merger McKesson Corporation Board members: (1) allowed the Plan to become saturated with McKesson Corporation stock; (2) failed to perform an adequate fiduciary review of the Plan in light of the merger's unique risks; and (3) continued to serve as fiduciaries despite a conflict of interest. CAC ¶¶ 198–220.

### A. Duty of Prudence

■ Plaintiffs claim that on October 18, 1998—when McKesson Corporation announced that it was going to merge with HBOC—McKesson Corporation stock comprised (1) all of the ESOP portion of the Plan and (2) three-quarters of Plan's total assets. CAC ¶ 199. Plaintiffs note that a plan need only contain 50% employer securities to qualify as an ESOP. *Id.* at ¶ 204. Thus, plaintiffs argue that the pre-merger McKesson Corporation Board members breached their fiduciary duties by failing to diversify the Plan in light of its "over-concentration" in company stock.

The parties vigorously dispute whether *Moench* or *Wright* require plaintiffs to allege that a company faced "impending doom" or "dire circumstances" to state a claim against fiduciaries for imprudently failing to diversify an ESOP. Both sides raise meritorious arguments. Plaintiffs correctly argue that neither *Moench* nor *Wright* expressly declares that such allegations are necessary. *Moench* holds that plaintiffs may rebut the presumption by "show[ing] that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction

---

**11.** The court also respectfully disagrees with *Kuper*, which followed *Moench* with no independent analysis. *See Kuper*, 66 F.3d at 1459 ("We agree with and adopt the Third Circuit's holding that a proper balance between the purpose of ERISA and the nature of ESOPs

requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion.").

**12.** Pietruski, Friedman, and Reichardt served on the Compensation Committee.

was in keeping with the settlor's expectations of how a prudent trustee would operate." *Moench,* 62 F.3d at 571. Common sense suggests that plaintiffs can prove that fiduciaries behaved "unreasonably" in various ways. At times, *Wright* seems to agree that this broad-based "reasonableness" standard controls.[13] *See Wright,* 360 F.3d at 1099 ("*Moench* ... merely requires fiduciaries to act reasonably"). However, *Wright* also appears to mandate that plaintiffs allege "unreasonableness" in a specific way: by claiming that fiduciaries did not diversify the ESOP even though the company faced insolvency. For example, *Wright* found dispositive that plaintiffs could not show that a reasonable fiduciary would have had concerns about Oremet's " 'viability as a company.' " *Wright,* 360 F.3d at 1098–99 (quoting *LaLonde v. Textron, Inc.,* 270 F.Supp.2d 272, 280 (D.R.I. 2003)).[14] In addition, *Wright* distinguished *Stein v. Smith,* 270 F.Supp.2d 157 (D.Mass.2003) and *Rankin v. Rots,* 278 F.Supp.2d 853 (E.D.Mich.2003)—two cases that denied motions to dismiss under *Moench*—on the grounds that "the allegations in *Smith* clearly implicated the company's viability as an ongoing concern" and "in *Rankin,* the company at issue ... went bankrupt." *Wright,* 360 F.3d at 1099 n. 5.[15] Finally, *Wright* reasoned that "[m]ere stock fluctuations, *even those that trend downward significantly,* are insufficient to establish the requisite imprudence to rebut the *Moench* presumption." *Id.* at 1099

(emphasis added). Thus, it is difficult to reconcile *Wright* and *Moench.*

However, a careful reading of *Moench* and *Wright* reveals a crucial difference between the two cases. Plaintiffs in *Moench* alleged that the Statewide fiduciaries imprudently continued to invest in company stock. *See Moench,* 62 F.3d at 558. The plan required fiduciaries to invest "primarily" in company stock. *Id.* at 567. *Moench* thus fashioned a rule to deal with a particular type of case: one where (1) the ESOP merely expressed a preference for investing in company stock and (2) the fiduciary did not need to violate the plan's terms to comply with plaintiffs' demands:

> *In a case such as this, in which the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted to make such investments,* while the fiduciary presumptively is required to invest in employer securities, there may come a time when such investments no longer serve the purpose of the trust, or the settlor's intent .... [W]e hold that in the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its

**13.** Again, *Wright* does so merely under the assumption that *Moench* is correct and that section 404's exemptions do not preclude such claims.

**14.** The First Circuit subsequently overruled *LaLonde. See LaLonde v. Textron, Inc.,* 369 F.3d 1 (1st Cir.2004). However, because *Wright* relies on more than just the district court's decision in *LaLonde,* the court believes that the First Circuit's decision does not caution against following *Wright.*

**15.** Plaintiffs correctly note that the ESOP in *Wright* permitted participants to sell 85% of the company stock in their accounts, while McKesson Corporation's ESOP did not permit participants to sell company stock at all. However, *Wright* does not rely upon the nature of the ESOP to reach its holding. In fact, as mentioned, *Wright* seems to rely only on the fact that Oremet continued to be a viable company. Thus, any difference between the ESOPs in *Wright* and the case at bar do not affect the outcome here.

discretion by investing in employer securities. [¶]. In attempting to rebut the presumption, the plaintiff may introduce evidence that 'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.'

*Id.* (quoting Rest. (Second) Trusts § 227 com. q) (emphasis added) (alteration in original).[16]

*Wright* involved a different kind of claim. In *Wright,* plaintiffs alleged that the fiduciaries violated section 404's prudence requirement by failing to investigate whether to sell company stock. *See Wright,* 360 F.3d at 1097. Critically, unlike *Moench,* where the fiduciaries could have complied with both the plan and plaintiffs' demands, in *Wright,* "[s]elling the stock ... would have been in violation of the Plan's express terms." *Id.* Thus, unlike *Moench, Wright* did not deal with claims that fiduciaries erred by taking some action that they were "more than simply permitted" but "not absolutely required" to do. *Moench,* 62 F.3d at 571. As *Moench* acknowledged, a different rule should apply when a plaintiff claims that an ESOP fiduciary imprudently failed to *violate the plan. See id.* ("[i]f the trust requires the fiduciary to invest in a particular stock, the trustee must comply unless 'compliance would be impossible ... or illegal' or a deviation is otherwise approved by the court") (quoting Rest. (Third) Trusts § 228, com. e). The provi-

sion in the Restatement (Second) of Trusts upon which *Moench* relies provides that when a trust does not permit the sale of a particular asset, the trustee may face liability for failing to apply for permission to deviate from the trust only "if there is an emergency." Rest. (Second) Trusts § 167(2). The Restatement explains that an "emergency" occurs when a trust holds stock that is likely to become "worthless":

> A bequeaths certain shares of stock to B in trust. By the terms of the trust B is not authorized to sell the shares. *Owing to a change of circumstances the shares become highly speculative and it is probable as the trustee realizes that they will ultimately become worthless,* and a reasonable trustee would apply to the court for permission to sell the shares. B retains the shares and makes no application to the court. The shares become worthless. B is liable to the beneficiary.

*Id.* coms. g-h, ill. 24 (emphasis added). Although *Wright* did not expressly adopt this standard, it faithfully applies it. *Wright* held that plaintiffs must allege "the sort of deteriorating financial circumstances involved in *Moench*" to state a claim. *See Wright,* 360 F.3d at 1098. *Moench* involved a company whose common stock fell from $18.25 to 25 cents in two years, making "the employees' ESOP accounts virtually worthless." *See Moench,* 62 F.3d at 557–59. Thus, *Wright* suggests that a plaintiff can only state a claim for a fiduciary's imprudent failure to

---

16. *Moench* claims to quote the Restatement (Second) of Trusts § 227 com. g. *See Moench,* 62 F.3d at 571. In fact, this quote derives from the Restatement (Second) of Trusts § 227 com. q. This provision applies the "unanticipated circumstances" rule stated in the Restatement (Second) of Trusts § 167. Although, as *Moench* acknowledges, the Restatement (Third) of Trusts § 66 alters the "unanticipated circumstances" rule, the Re-

statement (Second) of Trusts § 167 reflected the state of the law in 1974 when Congress " 'codif[ied] and ma[de] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.' " *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (quoting H.R.Rep. No. 93–533, p. 11 (1973), U.S.Code Cong. & Admin. News 1974, pp. 4639, 4649) (alterations added).

violate the plan and diversify an ESOP by alleging that the company faced insolvency.[17]

The McKesson Corporation fiduciaries would have violated the Plan if they had diversified the ESOP.[18] With the exception of Participant–Directed Funds, the Plan must hold company stock:

All Basic Contributions, Supplemental Contributions, Regular Contributions, Voluntary Contributions and Rollover Contributions ... shall be invested in the Participant–Directed Funds .... *All other assets under this Plan shall be invested in Company Stock.*

Plan § 11.2(e) (emphasis added).[19] The contributions mentioned on the list are all "Employee Contributions." *See* Plan §§ 3.1–3.4; 14.1–14.6. The ESOP portions of the Plan are not on the list: they are the "Quarterly Contributions," *id.* at § 3.8(d), the "Matching Employer Contributions," *id.* at §§ 4.1–4.9, the "Additional ESOP Match," *id.* at §§ 5.1–5.6, and the "Retirement Share Plan Contribution," *id.* at §§ 6.1–6.10. Because the ESOP portions of the Plan shall not "be invested in the Participant–Directed Funds," they "shall be invested in [c]ompany [s]tock." Although the Plan permits McKesson Corporation to choose between contributing cash or stock to the ESOP, the Plan also requires the company to convert the cash to stock "as soon as practicable." *Id.* at §§ 4.3(a)-(c). The ESOP therefore mandates that all assets ultimately take the form of company stock. This comports with the general purposes of the plan, which are, *inter alia,* "to provide employees a proprietary interest in McKesson Corporation through stock ownership" and "to promote greater interest of employees in the growth and development of McKes-

---

**17.** Similarly, in *In re Duke Energy ERISA Litig.*, 281 F.Supp.2d 786, 789 (W.D.N.C. 2003), an ESOP *required* Duke Energy to make matching contributions in company stock. Plaintiffs sued for breach of the duty of prudence, alleging, *inter alia,* that "[d]efendants should have prohibited Duke Energy from matching participants' contributions to the Plan in Duke Energy stock." *Id.* The court held that plaintiffs' claims "fai[l] as a matter of law" because defendant "is a solid, viable company, far from 'impending collapse,' and not in 'dire circumstances.'" *Id.* at 795. Consistent with *Wright, Duke* appears to mandate that plaintiffs allege that a company faced insolvency to state a claim for a fiduciary's failure to violate the plan and diversify an ESOP.

**18.** The court is aware that *Kuper* held that "a plan provision that completely prohibits diversification of ESOP assets necessarily violates the purposes of ERISA." *Kuper,* 66 F.3d at 1457. *Kuper* reached this conclusion by opining that section 404 does not require fiduciaries to follow a plan if doing so would be inconsistent with the prudence, loyalty, and diversification requirements. *See* 29 U.S.C. § 1104(d) (noting that fiduciaries must exercise their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter"). The court has doubts about *Kuper*'s conclusion. As *Moench* illustrates, the terms of the plan influence what is prudent under the plan. *See* Rest. (Third) Trusts § 228(b), com. d (noting that (1) "[a]s a general rule a trustee can *properly* make investments in such properties and in such manner as expressly or impliedly authorized by the terms of the trust" and (2) mandatory trust provisions "often displac[e] the normal duty of prudence") (emphasis added). In any event, the court does not interpret the Plan as "completely prohibit[ing] diversification." The Plan permits participants to sell the company stock held in their ESOP accounts when they become fifty-five, or when their age plus years of service exceed sixty-five years. Plan at § 11.5.

**19.** The court may consider the Plan on a motion to dismiss under the "incorporation by reference" doctrine. *See, e.g., Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994) (court may consider documents not attached to the complaint if the complaint refers to them and their authenticity is not questioned).

son Corporation." *Id.* at § 1.1. Finally, the Plan permits participants to diversify their ESOP holdings under certain conditions but says nothing about when fiduciaries may properly diversify the ESOP. *See id.* at § 11.5. This suggests that fiduciaries lack the power to diversify the ESOP. Therefore, the McKesson Corporation fiduciaries would have violated both the text and the purpose of the Plan if they had diversified the ESOP.

Accordingly, because plaintiffs' seventh cause of action does not allege that McKesson Corporation faced the prospect of an imminent collapse, plaintiffs fail to state a claim. Plaintiffs contend that the merger was dangerous because (1) "HBOC's market capitalization was actually greater than McKesson [Corporation's]" (2) 75% of all mergers "fail to achieve the financial results contemplated by the parties," (3) McKesson Corporation and HBOC were "different businesses operating in different segments of the healthcare industry," (4) McKesson Corporation and HBOC had recently "acquired numerous other businesses," thus exacerbating "[t]he potential difficulties in integrating" the two companies, (5) the CFRA Report and Deloitte questioned HBOC's accounting practices, and (6) "[h]aving 'all your eggs in one basket' is necessarily and inherently risky." CAC ¶¶ 208–211 (emphasis omitted).[20] Plaintiffs do not allege that McKesson Corporation's "viability as an ongoing concern" was at stake. *Wright,* 360 F.3d at 1099 n. 5. At best, plaintiffs' allegations establish that a reasonable fiduciary would have recognized that the merger *might* cause *some* loss to the Plan. Imposing section 404 liability under such circumstances would impermissibly open the floodgates to ERISA litigation any time a company made a major deal or merger. *See Wright,* 360 F.3d at 1099 ("[t]he *Moench* standard does not compel fiduciaries to permit further diversification of [ESOPs] upon each . . . major corporate development").[21] The court thus grants defendants' motion to dismiss this claim.

## B. Failing to Conduct a Fiduciary Review

Plaintiffs next allege that the pre-merger McKesson Corporation Board members breached their duties under section 404 by not "conduct[ing] a thorough ERISA fiduciary review for the purposes of determining the propriety of maintaining such a heavily weighted concentration of . . . Plan assets in McKesson [Corporation] stock" in anticipation of the merger. CAC ¶ 209.

■ However, the failure of plaintiffs' breach of the duty of prudence claim also dooms their failure to conduct a fiduciary review claim. As Justice Scalia persuasively reasoned in *Fink,* a plaintiff must show that an investment actually was imprudent before he can state a claim for failing to investigate other investment options:

> Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee, or perhaps even to recover trustee fees paid for the investigative and evaluative

---

**20.** Plaintiffs also claim that Pulido's alleged conflict of interest should affect this court's prudence analysis. CAC ¶ 211. As noted below, because plaintiffs have failed to articulate specific facts showing that Pulido did indeed have a conflict of interest, the court disagrees.

**21.** Plaintiffs argue that the court cannot require them to rebut the *Moench* presumption here because presumptions are evidentiary standards and thus not applicable on a motion to dismiss. *Wright* belies this claim. *See Wright,* 360 F.3d at 1097–98 (affirming dismissal of plaintiffs' causes of action under section 404 for failing to rebut the *Moench* presumption).

services that went unperformed. But it does not sustain an action for the damages arising from losing investments. I know of no case in which a trustee who has happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments (e.g., an investment in a highly regarded 'blue chip' stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand.

*Fink*, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part); *see also Wright*, 360 F.3d at 1097, 1099 (dismissing claims that ESOP fiduciaries "fail[ed] to investigate whether the sell the Plan's company's stock" because plaintiffs failed to show that refusing to sell company stock was, in fact, imprudent); *Kuper*, 66 F.3d at 1459 ("a fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable"); September Order at *5 (requiring plaintiffs to allege that "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident"). Refusing to divest the Plan of McKesson Corporation stock before the merger was not improvident. Thus, the McKesson Corporation Board members cannot be liable for failing to investigate other investment options.

## C. Duty of Loyalty

Plaintiffs allege that Pulido, McCall, and Bergonzi had a conflict of interest because they stood to gain from the merger, even if it meant jeopardizing Plan assets. CAC ¶¶ 211–216. However, plaintiffs bring their seventh cause of action against "the [p]re-[m]erger [i]ndividual McKesson [Corporation] Board [m]embers." *Id.* at ¶ 197. Plaintiffs allege that Bergonzi and McCall worked for HBOC before the merger. *Id.*

at ¶ 14. Thus, the court will evaluate plaintiffs' conflict of interest claim only as it pertains to Pulido. Plaintiffs allege that Pulido received "as much as $82.6 million" in stock options and restricted stock because of the merger. *Id.* at ¶ 211. Plaintiffs also assert that Pulido failed to consider "[t]he prudent sale of a percentage of McKesson [Corporation c]ompany [s]tock" because it would have been "inconsistent with the goal of promoting and completing" the merger. *Id.* at ¶ 213.

Plaintiffs rely heavily on language from *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982). In *Donovan*, Grumman Corporation officers also served as the company's ERISA plan trustees. LTV Corporation issued a tender offer for Grumman Corporation stock. The trustees decided that the plan would not only decline to tender its stock, but would purchase an additional 1,158,000 shares. In a passage upon which plaintiffs predicate their entire breach of loyalty argument, the Second Circuit opined that section 404 "imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Id.* at 271. However, *Donovan* cannot mean that a fiduciaries face liability for merely creating the *potential* for a conflict of interest. Indeed, "nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties." *Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir.1994); *Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("[u]nder ERISA ... a fiduciary may have financial interests adverse to beneficiaries").[22] Instead, the duty of loyalty re-

---

22. Notably, *Donovan* analogized to trust law to support its statement that trustees cannot

quires fiduciaries to refrain from actual disloyal conduct, not simply running the risk that such behavior will occur.[23] *Donovan* holds that the trustees breached their duty of loyalty by buying Grumman Corporation stock on behalf of the plan at an inflated price and creating the false impression in a letter to shareholders that LTV's pension fund had major liabilities. *Donovan*, 680 F.2d at 273–75. No case of which the court is aware has held that ERISA fiduciaries breach their duty of loyalty simply for "placing themselves in a position" where they might act disloyally.

Plaintiffs thus fail to state a claim for several reasons. First, even if plaintiffs are correct that *Donovan* requires Pulido to take some action to ameliorate the fact that his interests were adverse to those of participants, plaintiffs do not explain how Pulido's interests actually deviated from theirs. The fact that Pulido's McKesson HBOC stock vested more quickly because of the merger would seem to align his interest with that of other company shareholders. Pulido would gain little from a course of conduct that simultaneously increased the number of McKesson HBOC shares he held and drove McKesson HBOC's stock price down. Second, Pulido cannot be liable under ERISA for encouraging the merger because such conduct does not relate to his administration of the Plan. *See* 29 U.S.C. § 1104(1) ("a fiduciary

shall discharge *his duties with respect to a plan* solely in the interest of the participants and beneficiaries") (emphasis added); *In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d 745, 767–68 (S.D.N.Y.2003) (dismissing claim for breach of loyalty under section 404 because "[p]laintiffs do not allege that [defendant's] personal investments caused him to take or fail to take any actions detrimental to the Plan while he was wearing his 'fiduciary hat'"). Third, plaintiffs' claim that Pulido breached his duty of loyalty by putting himself in a position where he was less likely to consider "[t]he prudent sale of a percentage of McKesson [Corporation c]ompany [s]tock," CAC ¶ 213, seeks redress for a harm that never materialized: the imprudent retention of company stock. Because it was not imprudent to refuse to sell company stock, Pulido's alleged conflict could not have harmed plaintiffs. The court dismisses plaintiffs' seventh cause of action with prejudice.

### ii. Count Eight

Plaintiffs' eighth cause of action asserts that the McKesson HBOC Board members breached their fiduciary duties through conduct that occurred (1) after the January 12, 1999 merger and (2) "after allegedly uncovering but before announcing [HBOC's] accounting irregularities on

---

"place themselves in a position" where they might not function with complete loyalty to participants. *See Donovan*, 680 F.2d at 271 (citing II Scott on Trusts § 170, at 1297–99 (1967) and Bogert, The Law of Trusts and Trustees § 543 (2d ed.1978)). As the United States Supreme Court explained in *Pegram*, "the analogy between ERISA fiduciary and common law trustee becomes problematic [with respect to the duty of loyalty]. This is so because the trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats." *Pegram*, 530 U.S. at 225. Thus, the

language in *Donovan* stems from an outdated understanding of the duty of loyalty.

**23.** For example, fiduciaries cannot "mislead[ ] plan participants about the operation of a plan," *Adamczyk v. Lever Bros. Co., Div. of Conopco*, 991 F.Supp. 931, 939 (N.D.Ill. 1997), "receive commissions from insurance companies," *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir.2001), or put a company's financial interests ahead of a participant's interests in receiving a certain kind of treatment, *see Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir.1996).

April 28, 1999." CAC ¶ 224. During this time, the McKesson HBOC Board members included Pulido, McCall, McKesson Corporation Outside Directors Friendman, Reichardt and Seelenfruend, and HBOC Outside Directors Eckbert, Irby, Mayo, and Napier.[24] *Id.* at ¶ 21. The CAC alleges that the post-merger McKesson HBOC Board (1) failed to diversify the Plan, (2) failed to investigate the potential effect of the merger on the Plan, and (3) "plac[ed] themselves in a conflicted position which prevented them ... from functioning with complete loyalty to the ... Plan and its participants." CAC ¶¶ 221–235.

## A. Duty of Prudence

There are at least two problems with plaintiffs' post-merger/pre-announcement failure to diversify claim. For one, like the McKesson Corporation Plan, the McKesson HBOC Plan required that the ESOP's assets "shall be invested in [c]ompany [s]tock." McKesson HBOC Plan at § 11.2(e). Plaintiffs do not allege that McKesson HBOC faced an imminent financial collapse. Thus, under *Wright,* plaintiffs fail to rebut the *Moench* presumption.

■ In addition, the post-merger/pre-announcement McKesson HBOC Board members would have violated the securities laws if they divested the Plan of company stock before the company publicized HBOC's accounting irregularities. *See* September Order at *6–*8; *Wright,* 360 F.3d at 1098 n. 4 (criticizing *Moench* "to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees[, which] could potentially run afoul of the federal securities laws"); Employee Benefit Plans, Securities Act Release No. 33–6188, 1980 WL

29482, at *28, n. 168 (Feb. 1, 1980) (noting that antifraud provisions apply to a plan's issuance of participation interests and stock purchases by employees). Of course, federal law prohibits trading on the basis of material, non-public information such as HBOC's as-yet-publicized improprieties. *See, e.g., U.S. v. O'Hagan,* 521 U.S. 642, 643, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ("Under the 'traditional' or 'classical theory' of insider trading liability, a violation of § 10(b) and Rule 10b–5 occurs when a corporate insider trades in his corporation's securities on the basis of material, confidential information he has obtained by reason of his position.").

It is true that courts in other jurisdictions have determined, as a matter of public policy, that ERISA fiduciaries must disclose material nonpublic information. *See, e.g., In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.,* 312 F.Supp.2d 1165, 1181–82 (D.Minn.2004) ("ERISA plan fiduciaries cannot use the securities laws to shield themselves from potential liability for alleged breaches of their statutory duties"). Moreover, in *In re Syncor ERISA Litigation,* 351 F.Supp.2d 970, 984 (C.D.Cal.2004), a California district court declined to follow the September Order's view of the interaction between ERISA and the securities laws. In that case, plaintiffs alleged, *inter alia,* that defendants had failed to provide plan fiduciaries with information that the company was involved in a bribery scheme. The court denied defendants' motion to dismiss, reasoning that (1) *Wright*'s admonition that *Moench* was "problematic" to the extent in encouraged securities violations was *dicta* and (2) " '[a]s a matter of public policy, the statutes should be interpreted to require that persons *follow* the laws, not undermine them.' " *Id.* at 985 (quoting *In re*

---

**24.** Eckert and Irby served on the Compensation Committee.

*Enron,* 284 F.Supp.2d at 567) (emphasis in original).

*Syncor* relied heavily on *In re Enron,* 284 F.Supp.2d 511 (S.D.Tex.2003). *Enron* offered suggestions for dealing with the tension between ERISA and the securities laws when a section 404 fiduciary learns material, non-public information that threatens to impair the company's stock value. "First, and foremost," *Enron* reasoned, fiduciaries can "disclose the information to other shareholders and the public at large." *Id.* at 566. However, although this course of conduct complies with the securities laws, it would severely harm plan participants; indeed, any such disclosure would immediately cause the company's stock price to drop. *See, e.g., West v. Prudential Securities, Inc.,* 282 F.3d 935, 938 (7th Cir.2002) ("few propositions in economics are better established than the quick adjustment of securities prices to public information").[25] *Enron* also reasoned that selective disclosure to plan participants might be preferable because silence "would only serve to make the harm more widespread." *Id.* at 565. Yet there are strong countervailing policy considerations. Indeed, selective disclosure would benefit plan participants at the expense of general shareholders. Moreover, participants do not need a remedy under ERISA to obtain relief for a fiduciary's false statements or omissions; indeed, they can invoke the securities laws. In fact, that is exactly what the Plan has done in this case.[26]

■ Finally, nothing in ERISA's suggests that it renders federal securities statutes inapplicable. In fact, the opposite is true. For example, under section 404(c), a participant who exercises "independent control" over assets in his account relieves the plan fiduciary from accountability for any loss sustained. A participant's exercise of control is not "independent" if the "plan fiduciary has concealed material non-public facts regarding the investment ...." 29 C.F.R. 2550.404c–1(c)(2)(ii). However, this rule does not apply when "the disclosure of such information by the plan fiduciary to the participant ... would violate any provision of federal law ... which is not preempted by [ERISA]." *Id.* ERISA does not preempt federal securities laws. *See* 29 U.S.C. § 1144(d); *In the Matter of Cady, Roberts & Co.,* 40 S.E.C. 907, 1961 WL 60638 at *6 (Nov. 8, 1961) (explaining that a fiduciary

---

**25.** Similarly, at oral argument, plaintiffs' counsel suggested that fiduciaries such as McCall could have alleviated the Plan's losses by (1) not engaging in fraud or (2) publicly disclosing the accounting irregularities before the April 28 announcement. The problem with plaintiffs' first alternative is that ERISA imposes no obligation not to engage in fraud outside the plan. Indeed, section 404 only imposes duties "with respect to a plan." Thus, although fraud can be independently actionable, and a fiduciary's fraudulent administration of a plan would be actionable under ERISA, McCall cannot be liable under plaintiffs' theories for allegedly engaging in fraud that has nothing to do with the Plan's administration. Plaintiffs' second alternative does not explain how publicly disclosing the accounting irregularities would have avoided any loss to the Plan. Even if McCall had disclosed the accounting irregularities immediately after the merger, McKesson HBOC's stock price presumably would have taken the same precipitous plunge and any argument otherwise would be pure speculation.

**26.** At oral argument, plaintiffs' counsel argued that the securities laws might not afford the Plan complete relief because, as settlement negotiations in the Securities Litigation now stand, the Plan stands to receive only about ten cents on every dollar it lost. This argument is better addressed in the Securities Litigation itself, perhaps as an objection to any such settlement. It does not change the fact that plaintiffs should have viable fraud and securities causes of action against the individuals whose wrongdoing allegedly caused company stock to decline in value.

may not engage in insider trading). Therefore, under a different subdivision of section 404, a fiduciary cannot be liable for failing to utilize material, non-public information. This suggests that a fiduciary also cannot be liable for failing to diversify a plan when doing so would mean engaging in insider trading.

### B. Failing to Conduct a Fiduciary Review

For the reasons stated above, plaintiffs' failure to investigate claim fails. Because the post-merger/pre-announcement McKesson HBOC Board members did not imprudently fail to diversify the Plan, plaintiffs cannot show that a reasonable investigation would have revealed that failing to diversify the plan was imprudent.

### C. Duty of Loyalty

Plaintiffs' breach of the duty of loyalty claim alleges that "insiders and corporate directors are reluctant to sell company stock from a plan at any time, since the plan serves as a ready market for the stock [and] supports the price of the stock; therefore, sales could undermine the price of shares in the marketplace." CAC ¶ 228. This allegation fails because it neither relates to the administration of the Plan nor articulates a specific disloyal action. Plaintiffs also assert that the post-merger/pre-announcement McKesson HBOC Board members' "desire to demonstrate confidence in the recently completed [m]erger" prevented them from "proper[ly] consider[ing] whether to diversify" the Plan. *Id.* This allegation cannot survive the court's holding that it was not improper to fail to consider diversifying the Plan. For these reasons, the court dismisses plaintiffs' eighth cause of action with prejudice.

### ii. Count Nine

Plaintiffs' ninth cause of action alleges that the McKesson HBOC Board members breached their duties of prudence and loyalty after April 28, 1999, when the company brought HBOC's wrongdoing to public light. CAC ¶ 237.

### A. Duty of Prudence

Plaintiffs assert that McKesson HBOC's stock price fell from $65.75 per share to $34.50 per share the day after the announcement. *Id.* at ¶ 243. By May 2000, plaintiffs claim that McKesson HBOC stock was trading for just $15.75 per share. *Id.* at ¶ 244. Nevertheless, plaintiffs argue, the McKesson HBOC Board members did not consider divesting the Plan of company stock, therefore breaching their duty of prudence. *Id.* at ¶¶ 246–48.

Because plaintiffs do not allege that McKesson HBOC faced insolvency, they again fail to state a claim under *Wright*. *Wright* dismissed allegations that fiduciaries breached their duty of prudence by failing to permit plaintiffs to sell company stock when its price increased from $23 per share to $33 per share and then declined about 75% to $8 per share. *See Wright*, 360 F.3d at 1095–96. Plaintiffs' allegations are nearly identical: that McKesson HBOC's stock price dropped about 75%, from $65.75 per share to $15.75 per share. *Id.* at ¶ 243–44. In addition, neither *Kuper* nor *Moench* holds that a 75% decline in value is sufficient to rebut the *Moench* presumption. *See Kuper*, 66 F.3d at 1459–60 (holding after bench trial that decline of 80%, from $50 per share to $10 per share, did not rebut the *Moench* presumption); *cf. Moench*, 62 F.3d at 557, 572 (remanding case for district court to determine whether ESOP fiduciary's failure to sell company stock violated section 404 when company's stock price fell from

$18.25 per share to less than 25 cents per share).

## B. Duty of Loyalty

Plaintiffs allege that the McKesson HBOC Board members were conducting an internal audit process during this time. CAC ¶ 242. According to plaintiffs, the McKesson HBOC Board members "faced the specter that their position as Board Members, and any advance knowledge of additional improprieties that were uncovered at HBOC during the course of the investigation, would necessarily taint any decisions they should have considered as ERISA fiduciaries of the ... Plan during this time frame." *Id.* Again, plaintiffs seek to hold the McKesson HBOC Board members liable for creating the potential for a conflict of interest. As discussed above, such allegations do not state a claim for breach of the duty of loyalty. The court therefore dismisses plaintiffs' ninth cause of action with prejudice.

## 2. Count Ten

■ Plaintiffs' tenth cause of action claims that McKesson HBOC breached its duties under section 404 by contributing company stock rather than cash to the Plan in 1999. CAC ¶¶ 253–58. The Plan allowed McKesson HBOC to choose between contributing company stock or cash to be converted into company stock "as soon as practicable." Plan at §§ 4.3(a) & (c). The parties agree that only the 1999 fiscal year contribution is at issue. The parties also agree that McKesson HBOC (1) amended the closing date for this con-

tribution from March 31, 1999 to April 30, 1999, (2) used the post-announcement dollar value of McKesson HBOC stock, and (3) altered the contribution rate from 162% to 100%. If McKesson HBOC had not taken these three steps, participants would have received 24.55 shares of McKesson HBOC stock for every $1,000 contributed.[27] However, because McKesson HBOC pushed back the contribution date and amended the contribution rate, participants received 28.57 shares of McKesson HBOC stock for every $1,000 contributed.[28]

Defendants argue that plaintiffs' claim fails (1) under section 404's exemption of the duty to diversify from the duty of prudence and (2) "because [plaintiffs] cannot plead facts establishing that McKesson's continued viability was ever in question" under *Wright.* McKesson HBOC's Opp. Mot. Leav. Amend at 16:13–14. The court disagrees. First, the court does not construe plaintiffs' tenth cause of action as alleging that defendants failed to *diversify* plan assets. The word "diversify" means "[t]o balance (as an investment portfolio) defensively by dividing funds among securities of different industries or different classes." Webster's Ninth New Collegiate Dictionary 369 (1990). Unlike plaintiffs' seventh, eighth, and ninth causes of action, plaintiffs' tenth cause of action does not assert that McKesson HBOC improperly failed to cast a wide investment net. Instead, plaintiffs assert that McKesson HBOC made the wrong choice when faced with just two alternatives. Moreover, because McKesson HBOC would have to con-

---

**27.** On March 31, 1999 McKesson HBOC stock was trading for $66 per share and McKesson HBOC matched 162% of contributions. Thus, for every $1,000 contributed, McKesson would have matched $1,620 worth of stock at $66 dollars per share, for a total contribution of 24.55 shares.

**28.** On April 30, 1999 McKesson HBOC stock was trading for $35 per share and McKesson HBOC matched 100% of contributions. Thus, for every $1,000 contributed, McKesson would have matched $1,000 worth of stock at $35 dollars per share, for a total contribution of 28.57 shares.

vert any cash contribution to stock "as soon as practicable," plaintiffs' claim focuses more on Plan administration rather than investment policy. Thus, because the gravamen of plaintiffs' tenth cause of action is not that McKesson HBOC imprudently failed "to diversify," section 404's exemption does not bar plaintiffs' claim.

■ In addition, unlike plaintiffs' claims in *Wright,* plaintiffs' tenth cause of action does not allege that McKesson HBOC imprudently refused to deviate from the Plan's terms. Instead, as in *Moench,* plaintiffs allege that McKesson HBOC made the wrong decision *under the Plan:* that (1) the Plan gave McKesson HBOC discretion to choose between contributing stock or cash and (2) McKesson HBOC imprudently chose to contribute stock.[29] Under *Moench,* McKesson HBOC's decision was presumptively reasonable. Nevertheless, because McKesson HBOC would not have had to violate the Plan to comply with plaintiffs' demands, *Wright*'s ultra-deferential standard does not apply.[30] McKesson HBOC's contention that it continued to be a viable company during the

relevant time period thus does not definitively resolve the issue of whether a reasonable fiduciary would have made the April 1999 contribution in stock. It is theoretically possible that, on April 30, 1999, no reasonable fiduciary would have invested in McKesson HBOC stock instead of cash in light of the facts that (1) the company's stock price had just plunged from $65.75 per share to $34.50 per share and (2) the company's internal investigation was ongoing. CAC ¶ 243. Indeed, McKesson HBOC's stock price continued to decline. According to plaintiffs, by May 2000, it was trading for just $15.75 per share. *Id.* at ¶ 244. Arguably, McKesson HBOC could have minimized participants' losses by contributing cash to the Plan and deeming it "impracticable" to convert the cash into stock until the company's stock price stabilized or the investigation concluded. Indeed, "[e]ven though the Plan required the cash to be converted into company stock 'as soon as practicable,' what constitutes 'as soon as practicable' is not defined under the Plan and would

---

**29.** Although the Plan requires the ESOP ultimately to "be invested in [c]ompany [s]tock," the Plan also expressly permits McKesson HBOC initially to contribute cash. *Compare* McKesson HBOC Plan at § 11.2(e) *with id.* at §§ 4.3(a)-(c). The Plan thus contemplates that some time may pass between when McKesson HBOC contributes cash and converts it into stock. Accordingly, like defendants in *Moench,* McKesson HBOC could have complied with both plaintiffs' demands and the Plan.

**30.** Admittedly, *Wright* never purports to apply a more-deferential standard than *Moench.* However, it makes sense that a plaintiff must allege that a fiduciary engaged in patently unreasonable conduct to prove that the fiduciary abused his discretion by refusing to deviate from a plan's terms. As noted, under *Moench,* an over-zealous fiduciary who unnecessarily diversifies an ESOP *may* face liability if the court determines that the plan did

not permit diversification. However, when the plan clearly does not permit diversification, a fiduciary who violates these terms without good cause *will* face liability. Thus, *Wright* requires fiduciaries to take the extraordinary step of contravening the plan only when the plaintiff makes an extraordinary showing: that the company faced insolvency. Moreover, to the extent that both *Wright* and *Moench* claim to apply an "abuse of discretion" standard, the phrase "abuse of discretion" describes a malleable legal concept. *See, e.g.,* Henry J. Friendly, *Indiscretion About Discretion,* 31 Emory L.J. 747, 763 (1982) ("[t]here are a half dozen different definitions of 'abuse of discretion' "). Thus, the court finds nothing inconsistent with holding that plaintiffs may prove that McKesson HBOC abused its discretion by contributing stock to the Plan under circumstances where plaintiffs would not have proven that McKesson HBOC abused its discretion within the meaning of *Wright.*

seem to be an issue of fact to be determined by the circumstances." September Order at *8. McKesson HBOC's argument that it acted reasonably by pushing back the contribution date and using the post-announcement stock price is better suited for resolution at summary judgment or trial practice, not a motion to dismiss.[31] The court thus denies McKesson HBOC's motion to dismiss this aspect of plaintiffs' tenth cause of action.

### 3. Vicarious and Co–Fiduciary Liability

Plaintiffs' tenth and twelfth causes of action also allege that (1) McKesson HBOC is vicariously liable for the individual McKesson Corporation and McKesson HBOC members' wrongdoing and (2) that all defendants are liable under section 405's co-fiduciary principles. McKesson HBOC cannot be vicariously liable for the individual Board members' alleged wrongdoing because the court determined that these individuals did not violate section 404. Moreover, the court declines to impose co-fiduciary liability on the individual McKesson HBOC Board members for the company's alleged failure to contribute cash to the Plan. For one, section 405 conditions co-fiduciary liability on the fiduciary also committing a breach of duty under section 404. *See* 29 USC § 1105(a)(1) & (2) (section 405 "imposes liability on a plan fiduciary for breach of duty by another plan fiduciary if … *by his failure to comply with [section 404]* in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach") (emphasis add-

ed). The court has already held that the Board members are not fiduciaries with respect to the decision to contribute stock to the Plan. *See* September Order at *10 ("the only proper defendant for a claim of breach of duty based on the *form* of company contribution is the company") (emphasis in original). In any event, plaintiffs' section 405 claims do not comply with the September Order's mandate that plaintiffs support this allegations with specific facts. The court thus dismisses these causes of action with prejudice.

### 4. Count Thirteen

Plaintiffs' thirteenth cause of action alleges that McCall violated section 404 and should be required to make remedial relief under section 409. CAC ¶ 277. McCall became a member of the HBOC Board of Directors in 1991, and served as President and CEO of HBOC from 1991 until the merger. CAC ¶ 16. After the merger, McCall remained a member of the McKesson HBOC Board until June 21, 1999. *Id.* Plaintiffs allege that McCall participated in, directed, or otherwise knew of the accounting irregularities at HBOC. *Id.* at ¶ 278. Plaintiffs distinguish McCall from other fiduciaries who "may have first discovered the full extent of the accounting improprieties in April 1999, and may have been precluded from acting because of insider-trading restrictions." Pls.' Opp. Def. McCall's Mot. Dismiss at 2. Plaintiffs allege that Gilbertson implicated McCall after pleading guilty to committing accounting improprieties. *Id.* Therefore, plaintiffs contend, even if McCall was precluded from disclosing material nonpublic information to Plan participants, or from di-

---

**31.** McKesson HBOC also argues that its stock price on April 30, 1999 would reflect the market's awareness of the ongoing investigation and potential for further restatements. Yet even if true, this fact does not mean that investing in company stock was inherently reasonable. In fact, as noted, McKesson HBOC's stock continued to decline for about a year. Thus, this argument does not eliminate the possibility that McKesson HBOC imprudently chose to contribute stock to the Plan.

vesting the Plan of company stock, he should still be required to restore the losses he caused under principles of equity. Plaintiffs submit that absent equitable relief, McCall would "profit" from his alleged wrongdoings by hiding behind the securities laws. CAC ¶ 280. Finally, plaintiffs suggest that the equitable doctrine of unclean hands makes McCall liable.

■■■ However, McCall's alleged wrongdoings fall within the purview of federal securities laws. As plaintiffs have noted, the allegations of fact against McCall in the CAC "were adequate for the Court to find sufficient evidence of scienter—knowing and intentional fraudulent conduct—under the securities law[s], in the McKesson securities litigation." Pls.' Opp. Def. McCall's Motion Dismiss at 19. The court is unwilling to create new law under ERISA when plaintiffs may obtain the same relief elsewhere by conventional means. The court is also not aware of any case in which a plaintiff has received relief under the doctrine of unclean hands. Indeed, unclean hands is an equitable defense, not a cause of action. The court therefore dismisses plaintiffs' thirteenth cause of action with prejudice.

### C. Motion for Leave to Amend

#### 1. Count Seven Under the SCAC

The SCAC's only change to count seven—plaintiffs' pre-merger breach claim—is additional citations for the proposition that "75% of all mergers fail to achieve expected results." SCAC ¶ 122(a). Under *Wright,* this allegation does not suffice to rebut the *Moench* presumption. Thus, plaintiffs' proposed amendment is futile.

#### 2. Count Eight Under the SCAC

With respect to plaintiffs' post-merger/pre-announcement claim, the SCAC adds allegations that McCall, Pulido, Hawkins, and Bergonzi "participated in" and "knew, or should have known, that fraudulent and illegal conduct which impaired McKesson [HBOC] [s]tock ... occurred at McKesson [HBOC], under the direction of supervision of senior McKesson [HBOC] officers, from the first day of the merger with HBOC on January 12, 1999." SCAC ¶ 140A (emphasis omitted).[32] Plaintiffs argue that an ESOP fiduciary who continues to invest in company stock despite being aware of or involved in fraud breaches their duties of loyalty and prudence.

#### a. Breach of Duty of Loyalty

■■■ None of plaintiffs' breach of duty allegations relate to the actual administration of the Plan. Indeed, the SCAC describes "improper recognition" of "thirty-seven contracts" and "use of and accounting for 'side letters' and other forms of contingencies." SCAC ¶¶ 140A–B. However, as noted, section 404 does not cover corporate wrongdoing that is unrelated to plan administration. Amendment thus would be futile.

#### b. Breach of Duty of Prudence

Plaintiffs assert that McCall, Pulido, Hawkins, and Bergonzi's alleged fraud rendered continued investment in McKesson HBOC stock imprudent during the pre-announcement period. Plaintiffs rely on *Syncor,* where high level managers at Syncor were involved in an international bribery scheme. *Syncor,* 351 F.Supp.2d at

---

**32.** Plaintiffs contend in their brief that "it was specific illegal transactions in the post-merger period at McKesson ... and *not* the pre-merger fraud at HBOC ... that caused the April 28, 1999 restatement and the Plan los-

ing $800 million in market value in one day." Pla's Mot. Leave Amend at 6:14–17 (emphasis in original). However, this allegation does not appear anywhere in the SCAC.

970. Another company's pre-merger due diligence revealed the wrongdoing, causing Syncor stock to lose half its value in just two trading days. Plaintiffs sued for violation of the duty of prudence. Although the plan required fiduciaries to invest in company stock, the court seized upon a line from *Wright* to hold that plaintiffs may rebut the *Moench* presumption by alleging *either* that (1) a company faced impending bankruptcy or (2) was being seriously mismanaged:

> The Court in *Wright* did not state that a company must be on the brink of collapse. Wright cites to the *La[L]onde* district court case which was subsequently overruled by the First Circuit. The Ninth Circuit relies on language in *La[L]onde* stating that the presumption of reasonableness may be overcome when a decline in employer stock is combined with 'evidence that the company is on the brink of collapse or undergoing serious mismanagement.' The word 'or' indicates that the company may be on the brink of collapse or facing mismanagement.

*Syncor*, 351 F.Supp.2d at 981–82 (citations omitted). The court then distinguished *Wright* on the grounds that the plaintiffs in the case at bar "ha[d] not merely alleged stock fluctuations" but had also "alleged that [d]efendants seriously mismanaged the company." *Id.* at 980. The court thus denied Syncor's motion to dismiss because plaintiffs had pled that the company knew or should have known about the bribery. *Id.* at 982.

 The court respectfully submits that *Syncor* understates what *Wright* holds is needed to overcome the *Moench* presumption. As noted above, the key inquiry under *Wright* is whether a company's stock is soon to become worthless— not whether defendants engaged in inequitable conduct. Accordingly, an investment is not imprudent simply because a bad actor makes it. A failure to diversify investments when the plan calls for investment in company stock is imprudent, if at all, only if the company is on the brink of collapse thus placing a participants' entire savings in serious jeopardy. *See In re Calpine Corp. ERISA Litigation*, 2005 WL 1431506, *5 (N.D.Cal.2005) (holding that *Wright* requires allegations of seriously deteriorating financial condition and a genuine risk of insider self-dealing to state a claim for breach of the duty of prudence).

In any event, *Syncor* is distinguishable. *Syncor* allowed plaintiffs' prudence claims to survive because plaintiffs alleged mismanagement plus "a steep decline in the value of the company stock ... which suggest[ed] that continued investment in Syncor stock might not have been ... prudent ...." *Syncor*, 351 F.Supp.2d at 982. Here, however, plaintiffs' eighth cause of action is limited to the time before McKesson HBOC stock actually began to decline in value. Thus, plaintiffs attempt to predicate section 404 liability solely on the post-merger/pre-announcement McKesson HBOC Board members' knowledge that, if the fraud came to light, McKesson HBOC stock would likely decline. *Cf. Syncor*, 351 F.Supp.2d at 981 (reading *Wright* to hold that a plaintiff may rebut the *Moench* presumption by alleging *both* that company stock declined *and* that the company was being mismanaged). Finally, plaintiffs' proposed amendment does not cure the problem that selling McKesson HBOC stock to diversify the Plan on the basis of material, non-public information would have violated the securities laws. Amendment thus would be futile.

Plaintiffs also argue that the SCAC alleges that the McKesson HBOC Board members never "considered nor evaluated the prudence of the investment policy of the McKesson [HBOC] Plan regarding its

holdings in McKesson [HBOC] stock, or whether to continue contributing cash or ... [s]tock to the Plan ... at any time during this timeframe ...." *Id.* at ¶ 140E (emphasis omitted). Plaintiffs claim that *Moench* held that fiduciaries must exercise their discretion before enjoying the presumption of reasonableness. However, *Moench* involved a situation where there was no evidence that the fiduciaries ever "met to discuss any possible effects on the ESOP or any actions that it should take." *Moench,* 62 F.3d at 559. Here, documents attached to the SCAC reveal that the McKesson HBOC fiduciaries met and discussed investment policy. *See* SCAC Ex. E, Seelenfruend Depo. at 230:9–16 (Seelenfruend testifying that "[t]here were at least annual investment reviews that were designed to evaluate the ... investment performance of outside managers who were retained to invest the employee contributions in th[e] plan"). The court need not consider allegations that "are contradicted by documents referred to in the complaint." *Wright,* 360 F.3d at 1096 (quotation omitted). In addition, plaintiffs *Kuper* made identical claims. *See Kuper,* 66 F.3d at 1450–51 (alleging that no member of the Quantum benefits committee ever considered altering the ESOP). *Kuper* nevertheless applied the *Moench* presumption. Because these allegations add nothing to plaintiffs' case, the court denies plaintiffs' motion for leave to amend.[33]

### III. ORDER

For the foregoing reasons, the court (1) grants defendants' motions to dismiss the CAC with prejudice except for plaintiffs' allegations that McKesson HBOC breached its duty of prudence by contributing stock to the Plan on April 30, 1999, (2)

---

**33.** The SCAC contains no new allegations with respect to plaintiffs' surviving claim that McKesson Corporation breached its duty of

denies defendants' motions to dismiss with respect to plaintiffs' allegations that McKesson HBOC breached its duty of prudence by contributing stock to the Plan on April 30, 1999, and (3) denies plaintiffs' motion for leave to file the SCAC.

prudence by contributing stock to the plan on April 30, 1999. Denying amendment thus does not affect this cause of action.